[Crim. No. 24878. Second Dist., Div. Four. Jan. 17, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
WYN RUMMLER, Defendant and Appellant.

COUNSEL

Wyn Rummler, in pro. per., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Lawrence P. Scherb II, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**DUNN, J.**—An information in two counts charged defendant Rummler with (count I) violation of Business and Professions Code section 2141.5 (willful and hazardous practice of medicine without a license), a felony, on or about 24 September 1970, and (count II) violation of Penal Code section 487, subdivision 1, i.e.: grand theft, a felony, the same day. Defendant pled not guilty. A jury found him guilty of count I and not guilty of count II. Further criminal proceedings were suspended and defendant was ordered placed upon three years' probation under various conditions. He appeals from the order for probation (judgment, Pen. Code, § 1237).

In the trial court and here defendant appears in pro. per. His first contention is that a withdrawal, at one time, of his pro. per. status "was intended to handicap and did severely handicap his defense." The clerk's transcript discloses that on 29 March 1973, defendant's motion to appear in pro. per. was denied but that, seven days later, on 5 April 1973, the same judge (Rosenthal) granted him such right and, thereafter, he so appeared,

filing numerous motions. The trial did not begin until October 1973. Our attention is invited to no part of the record supporting the claimed error.

■ Defendant next contends the court (London) erred at his Penal Code section 1538.5 hearing, begun 5 October 1973, when it quashed the subpoena defendant caused to be issued for Dr. Richard Aronsohn. The subpoena was issued for Dr. Aronsohn to testify at the hearing and was quashed on the prosecution's motion.

The 1538.5 hearing was based upon defendant's efforts to traverse a search warrant (Pen. Code, § 1538.5, subd. (a)(2)) pursuant to the execution of which an officer (Gentile) had recovered various items from an establishment operated jointly by defendant and a Mrs. Uber. Gentile had submitted an affidavit to the magistrate in support of the search warrant. In the affidavit he had stated that Dr. Aronsohn had informed him that the complaining witness, Mrs. Flagel,[1] had exhibited to him burns caused by the use of phenol in a strength ranging between 50-88 percent. Gentile, Phyliss Dowdell and the complaining witness, Dorothy Flagel, all had been called by defendant and testified as witnesses for him on his motion. Defendant wished to call Dr. Aronsohn to testify that he had not so stated to Gentile.

The prosecution argued that: (1) the prosecution was not for a misdemeanor under Business and Professions Code section 7415 but was for the unlawful practice of medicine under Business and Professions Code section 2141.5 and (2) even if Dr. Aronsohn was misquoted in Gentile's affidavit, such would be irrelevant inasmuch as there was ample matter also alleged in Gentile's affidavit to justify issuance of the warrant, so that eliminating the claimed statements of Dr. Aronsohn would accomplish nothing. On the basis of this response, the deputy district attorney opined that no hearing, such as discussed in *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234] was required or merited.

The trial court concluded there was no material inconsistency revealed and quashed defendant's subpoena. We are not concerned with determining whether the inaccuracies in the affidavit were due to intention, or to unreasonable or inadvertent causes (*Theodor,* p. 97), but merely with whether such inaccuracies are pertinent. Thus, *Theodor* states (p. 101)

---

[1]Although the witness' name is spelled several different ways in the transcript, she testified "Flagel" is her legal name and is the correct spelling of it; the names were similar in pronunciation, in any event.

that: "If the defendant seeks to controvert the allegations contained therein, it is his duty to come forth to reveal any inaccuracies." And, again (p. 103) "Before a hearing is required to test the veracity of an affidavit, the defense must relate, with some specificity, its reasons for contending that the affidavit is inaccurate."

In our case, Gentile testified as a witness for defendant that Mrs. Flagel stated to him that phenol had been used on her by Mrs. Uber and had badly burned her; that Dr. Aronsohn had examined Mrs. Flagel and thereafter had told him that phenol was used in a strength ranging from 50-88 percent. Mrs. Flagel herself testified at the hearing on the motion that she had been burned.

From Mrs. Flagel's testimony that she sustained burns, the court justifiably could conclude under the evidence that phenol was applied to her face, arms and hands in a strength greater than the 10 percent allowed to cosmetologists by Business and Professions Code section 7415.[2] Thus, whether the reported opinion of Dr. Aronsohn (that the strength ranged from 50-88 percent) was, or was not accurately reported is irrelevant. The magistrate would have been justified in issuing the warrant; a contradiction in this respect of Gentile's affidavit would be irrelevant. We conclude that *Theodor's* (8 Cal.3d, *supra*) rule is limited to hearings dealing with significant or consequential inaccuracies, not affecting the result, and affirm the trial court's order quashing the subpoena.

■ Defendant's third contention is closely related to the contention just discussed and falls with it. Defendant appears mistakenly to assume that his prosecution under Business and Professions Code section 2141.5 was absolutely defensible by showing that he was guilty of a misdemeanor under Business and Professions Code section 7415. However, it is well to keep in mind that his prosecution was not based upon his use of phenol in a solution stronger than 10 percent but for personally, or aiding and abetting a person who "willfully, under circumstances or conditions which cause or create risk of great bodily harm . . . or death, practices . . . any system or mode of treating the sick . . . or . . . treats . . . any . . . blemish . . . disfigurement . . . or physical condition of any person, without having . . . a valid . . . certificate [to practice medicine] . . . ." (Bus. & Prof. Code, § 2141.5.)

[2]Business and Professions Code section 7415 reads in part: "Any licensee who . . . applies to any human being a solution of phenol greater than ten per cent . . . is guilty of a misdemeanor . . . ."

"Licensee" refers to a licensed cosmetologist. (Bus. & Prof. Code, § 7320 et seq.)

The fourth contention relates to a statement purportedly appearing in the search warrant affidavit relating to count II, i.e.: grand theft, and that contention also falls; defendant was found not guilty of that count by the jury, a fact defendant recognizes.

Defendant's fifth contention relating to the search warrant affidavit likewise is invalid, needing no discussion.

■ Sixth, defendant contends the trial court (Light) erred in commenting during the trial and in instructing the jury on the law at the conclusion of the trial. In its instructions the court stated: "The art of cosmetology includes beautifying the face, neck and arms by use of cosmetic preparations, antiseptics, tonics, lotions or creams." ·

Thereafter, the court gave as follows the instruction now complained of: "It is the practice of medicine and requires a physician's and surgeon's certificate to apply to a human being in the furtherance of any treatment for any ailment, blemish, disorder or other physical condition any substance which both penetrates and alters human tissue; except that a licensed cosmetologist practising the art of cosmetology is authorized to apply to a human being a solution which has 10% or less of phenol as its only ingredient which both penetrates and alters human tissue."

Defendant cites no authority for his contention that the foregoing instruction, and comment by the court along the same line, was erroneous. As opposed to defendant, we have noted the fully supportive testimony of Dr. Aronsohn, given as an expert witness for the People during their case in chief; we also have noted Business and Professions Code sections 2141, 2141.5 and 7415.[3] We find no error in the court's comment or the formal instruction which paraphrased the former.

---

[3]Business and Professions Code section 2141 regarding the practice of medicine reads: "Any person, who practices or . . . who . . . treats, operates for . . . any ailment, blemish . . . without having at the time of so doing a valid, unrevoked certificate as provided in this chapter . . . is guilty of a misdemeanor."

Business and Professions Code section 2141.5 states in pertinent part: "Any person who willfully, under circumstances or conditions which cause or create risk of great bodily harm . . . or death . . . treats, operates for, or prescribes for any . . . blemish . . . or physical condition of any person, without having at the time of so doing a valid, unrevoked certificate as provided in this chapter . . . is punishable by imprisonment in the county jail . . . or in the state prison . . . ."

Regarding section 7415, see footnote 2.

Business and Professions Code section 2137 states the authority of a licensed physician and surgeon.

At trial the People called Dr. Aronsohn as a witness. He testified to having examined Mrs. Flagel as an expert, also defining "chemosurgery" as involving "alteration of the structure of the body" and giving his own definition of the practice of medicine[4] as "anything performed to the body or on the body that either changes the tissue, the structure of the tissue or an organ or changes the physiology of a body." In his own practice as a plastic surgeon he used phenol, trichlorocetic acid, resorcinol and salicylic acid, all being corrosive substances; it was his "very firm" opinion on examining Mrs. Flagel that a corrosive agent had been applied to her face and hands; such application can induce bodily harm, such as scarring, hypo or hyperpigmentation and even death, requiring that the patient's cardiovascular and pulmonary systems be monitored; "phenol" is carbolic acid and, when properly diluted, may penetrate the outer skin layer; when used in concentrations of 50-60 percent "you are running a risk of getting scarring. Even in a physician's hands, I think it's unpredictable at that point"; resorcinol is also a "phenolic compound"; a solution used in a face-altering procedure comprised of one part phenol, three and one-half parts resorcinol, one and one-half parts salicylic acid and four parts alcohol[5] would have the effect of corroding the skin, "you would get scarring" and, if used without monitoring the heart or respiration, could cause serious danger; death could occur; the skin is in layers; the top layer is the "epidermis" beneath which are three-four layers of "dermis"; "The skin is a natural barrier. Once you penetrate the epidermis, you can alter the structure of that skin. It comes under the auspices of a drug under F.D.A. ruling"; in the case of Mrs. Flagel, not only the epidermis but the dermis had been penetrated.

A chemist testified that "Phenols are a class of compound. Resorcinol is another type of phenol" and is corrosive or caustic in its action. A pharmacist testified that phenol and resorcinol "both are phenolic in character" and that "both are caustic to the skin, depending upon the concentration used." A combination of 10 percent phenol with 35 percent resorcinol in a solution containing alcohol and salicylic acid "would have a high degree of causticity." If there were 15 percent salicylic acid and 40 percent alcohol the "Salicylic acid would increase the cuasticity [*sic*], yes."

---

[4] The "practice of medicine" is not defined in the Business and Professions Code.

[5] The mixture testified to by Mrs. Uber as being used by her was: one part phenol, two and one-half parts resorcinol, one and one-half parts salicylic acid and four parts alcohol. Gentile, pursuant to the search warrant, had procured three bottles from Mrs. Uber's apartment, the contents of which were testified to by a chemist as containing 53 percent, 54 percent and 96 percent "phenolic type substance."

Defendant's complaint against the instruction flies in the face of this evidence; his contention concerning the instruction and the court's use of the term "derivative," in effect, is rejected.

In his closing brief, appellant states his position that the procedure followed was "an act of cosmetology" and not the practice of medicine. He further states that: "On the same grounds appellant is appealing the denial of his motion under Penal Code Section 995 and the overruling of his Demurrer." Defendant relies upon *Whitcomb* v. *Emerson* (1941) 46 Cal.App.2d 263 [115 P.2d 892] but, there, the facts were so entirely different that discussion of the case in conjunction with the present one is fruitless. There was sufficient evidence to support the information in the present case and we cannot substitute our judgment as to its weight. (*Williams* v. *Superior Court* (1969) 71 Cal.2d 1144, 1147-1149 [80 Cal.Rptr. 747, 81 Cal.Rptr. 761, 458 P.2d 987]; *People* v. *Malich* (1971) 15 Cal.App.3d 253, 264-265 [93 Cal.Rptr. 87], disapproved on other grounds in *People* v. *Medina* (1972) 6 Cal.3d 484, 489 [99 Cal.Rptr. 630, 492 P.2d 686]; *Buck* v. *Superior Court* (1965) 232 Cal.App.2d 153, 160-161 [42 Cal.Rptr. 527, 11 A.L.R.3d 1064].)

Defendant argues that Business and Professions Code section 7415 specifically permits the cosmetologist to use more than one ingredient that "penetrates and alters skin." This may be true, but the above evidence indicates phenolic compounds in solution "greater than ten per cent" was applied by Mrs. Uber to Mrs. Flagel and that the same was risky. If the evidence was such as to indicate a "phenolic compound" is not the same as "phenol," defendant was at liberty to argue this evidence. If he did not, the oversight was his and he may not now complain.

The present case is to be distinguished from *People* v. *Penny* (1955) 44 Cal.2d 861 [285 P.2d 926]. There, defendant was charged with a homicide, "involuntary manslaughter," resulting from applying phenol to a victim's face. Although defendant was not licensed, the Supreme Court there stated that, as a matter of law, defendant was engaged in the practice of cosmetology and the jury should have been so instructed. Defendant seizes upon this phrase as though exonerating him in the present case. It does not. Defendant in *Penny* was not charged, as here, with willfully practicing hazardous medicine without a license but with

homicide under Penal Code section 192, subdivision 2.[6] The court reversed inasmuch as instructions given to the jury erroneously defined negligent homicide. One such instruction erroneously permitted the jury to infer that the unlicensed appellant there applied phenol in a solution which, if she were licensed, would have been a misdemeanor, only. Here, however, defendant Rummler was not charged with using phenol in solution stronger than 10 percent, but with willfully practicing hazardous medicine without a license to do so.

■ Next, defendant contends the trial court unfairly limited appellant's right to testify in his own defense. This complaint relates to defendant's efforts to qualify himself as an expert. His argument cites no authority and directs our attention only generally to the record. No error is made to appear. Thus, first, the court sustained an objection to defendant's testimony but defendant ignored the court's ruling and kept right on with his answer. Next, he attempted to display to the jury "advertising brochures in which I was used as a model," and the court sustained objection to them. He next testified to letters of inquiry he had written requesting information as to books he might read. Objection to this testimony was overruled. He then endeavored to offer names of various "authorities" he had received "as proof that I had indeed made these inquiries." The trial court stated such was not relevant. We find no error.

■ Defendant next contends the trial court improperly restricted his "right to question Mrs. Fleigel as to bias and interest." We do not find it so.

Defendant called Mrs. Flagel as a witness and endeavored to impeach her for bias (Evid. Code, § 780, subd. (f)), by showing that on an earlier occasion she had stated "to the Judge in Department E in Van Nuys on or about October 10th that you had had to return from Europe in order to testify in this case through my unreasonableness." Mrs. Flagel responded, "I certainly did . . . . 24 times." Defendant's next question to Mrs. Flagel inquired if she had a passport to Europe. The prosecution's objection was sustained, the court adding, "Whether Mrs. Fleigel had to go to Europe or whether she didn't, whether she told the Judge the truth or not is not relevant to the issues in this case. Or, has so little relevancy

---

[6]Penal Code section 192 reads in part: "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds: . . . 2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection . . . ."

and opens up so many other avenues, that the Court will exclude it under 352 of the Evidence Code." Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." No abuse of the trial court's discretion is made to appear. Defendant's other complaints, regarding his efforts to impeach Mrs. Flagel, all relate to her testimony regarding her jewelry and are irrelevant to this appeal, defendant having been found not guilty of the grand theft relating to it.

Defendant next contends the charge of grand theft was intended only to "inflame the jury while it considered the medical charge." No merit to this contention is shown and we discuss it no further, there being no showing to discuss.

Next, defendant contends Business and Professions Code sections 7321 and 7415 are unconstitutional, as are sections 651.3, 2399 and 7325. In his closing brief appellant also attacks the constitutionality of Business and Professions Code section 2141.5. Without detailing the varied bases for defendant's attacks, we reject them.

In his closing brief, defendant asserts "appellant's motives in performing the face rejuvenation procedure and any conduct by appellant other than said performance are immaterial to the issues of this appeal." His argument is improperly raised for the first time in his closing brief. (See: 6 Witkin, Cal. Procedure (2d ed.) Appeal, § 442, pp. 4405-4406.) In addition, his argument lacks any merit.

The judgment is affirmed.

Jefferson, Acting P. J., and Cole, J.,* concurred.

A petition for a rehearing was denied February 4, 1975, and appellant's petition for a hearing by the Supreme Court was denied March 26, 1975.

---

*Assigned by the Chairman of the Judicial Council.